**In re Robert Jay ROWEN, Debtor.**

**Robert Jay Rowen, Plaintiff,**

**v.**

**United States of America, Defendant.**

**Bankruptcy No. A01–00664–DMD.**
**Adversary No. 01–3061.**

United States Bankruptcy Court,
D. Alaska.

May 5, 2003.

Ronald A. Offret, Aglietti & Offret, Anchorage, AK, for Robert Jay Rowen, Debtor.

### *MEMORANDUM DECISION*

DONALD MACDONALD, IV, Chief Judge.

This is a proceeding to determine the dischargeability of federal income taxes under 11 U.S.C. § 523(a)(1). It is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). Jurisdiction arises from 28 U.S.C. § 1334(b) and the United States District Court's order of reference. I find in favor of the United States. The debtor has willfully attempted to evade and defeat taxes and his federal tax liability for the years 1992 through 1997 is excepted from discharge pursuant to 11 U.S.C. § 523(a)(1)(C).

*Factual Background*

The debtor, Robert J. Rowen, is a physician who practiced in Alaska from 1979 until October of 2001. He worked for Indian Health Services for approximately four years, and then went into private practice, focusing on alternative medicine. Rowen often recommended nutritional supplements to his patients. He initially kept a small inventory of such supple-

ments in his medical office and sold them to his patients.

Rowen had divorced shortly after moving to Alaska, and did not have substantial assets at the time he started his private practice. He had a two bedroom condominium, some used cars and his office equipment. Although he carried malpractice insurance, Rowen testified that he was concerned about the risk of lawsuits. He also wanted to find a way to repay his father, who had loaned him money to help set up his medical practice. He attended an asset protection seminar put on by Equitrust Consultants which recommended the creation of a three-tiered trust arrangement to protect assets from creditors. After the seminar, Rowen was interested in getting more information about this trust arrangement, so he contacted Richard Stradley, an attorney in Oregon, whose opinion letter regarding the validity of the tiered trust arrangement was included in the Equitrust seminar materials.

Rowen established the Quantum Health Trust in March of 1991, after several conversations with Stradley. It was an irrevocable trust. Stradley was named the trustee of the trust. Rowen was appointed the general manager, in charge of overseeing the day to day business affairs of the trust, and his father, Sidney Rowen, was the sole beneficiary of the trust. As settlor of the trust, Rowen conveyed a small amount of cash, some stock, his nutritional supplement inventory and practically all of the furniture, fixtures and equipment in his office (right down to the plastic floor mats and small oscillating fans) to the trust.[1]

Rowen continued with his medical practice after establishing Quantum Health Trust. He leased back the furniture, fixtures and equipment he had placed into the trust, and continued to use these assets in his medical practice. He no longer sold nutritional supplements out of his office, though. A separate office was set up adjacent to his exclusively for the sale of nutritional supplements.

Shortly after Quantum Health Trust was created, two more trusts were created in the Republic of Nauru. Shalom Enterprises was created on April 1, 1991. Julia S. Sapalong was the settlor of the trust; Pac–West Bank & Trust Co., Inc. was the trustee. At about the same time, Eagle Investments was created. Shalom Enterprises was the settlor and East–West Bank of Commerce, Inc. was the trustee. In June of 1991, Sidney Rowen conveyed his beneficial interest in Quantum Health Trust to Eagle Investments. Sidney became the ultimate beneficiary of the three-tiered trust arrangement. Rowen said he wasn't involved with the set up of these additional trusts, but they were created by Stradley as part of the three-tiered trust arrangement that Equitrust Consultants had promoted. Rowen said the two additional trusts were established offshore for tax deferral purposes.

About the same time Rowen set up Quantum Health Trust, he ceased filing Form 1040 federal tax returns and paying income taxes. In 1991, he filed a Form 1040NR, or U.S. Nonresident Alien Income Tax Return,[2] on which he claimed

---

1. Rowen did not transfer his condominium or vehicles to the trust.

2. According to its instructions, this form was to be used if, during 1991: 1) the filer was a nonresident alien engaged in a trade or business in the United States; 2) the filer was a nonresident alien not engaged in a trade or business in the United States with income on which not all U.S. tax that was owed was withheld; 3) the filer represented a deceased person who would have had to file Form 1040NR; or 4) the filer represented an estate or trust that would have had to file Form 1040NR. *See* Def.'s Ex. HH.

entitlement to a sizeable tax refund. Rowen is a United States citizen, but testified that he believed, at the time he filed the Form 1040NR, he was in fact a non-resident alien.[3] He said this belief was based on information from a seminar attended by his business manager in 1991, his own personal research of the tax laws, and consultations he had with Stradley.

In March, 1993, Rowen was informed by agents of the Internal Revenue Service that he was under investigation for potential criminal tax violations.[4] In August of 1993, while this investigation was ongoing, Rowen filed a state court suit against his former accountant, Nora Elliott, and the investigating revenue agents, seeking damages in excess of $250,000.00. Rowen filed the suit to thwart the criminal tax investigation and intimidate his accountant so she wouldn't comply with summonses issued by the revenue agents for various of Rowen's records.[5] Rowen testified that he felt the investigating revenue agents and his accountant had violated his civil rights. This state court action was dismissed on motion of the United States, on January 14, 1994.[6]

Slightly more than one year after the state civil action had been dismissed, and while the criminal investigation was still pending, Rowen sold his condominium. He testified that, at that point in time, he thought it would be nice for him and his parents to have a house in Anchorage. Rowen's parents lived in Florida, not Alaska. But Rowen stated that a house in Anchorage would benefit his parents, as well. They came to visit from time to time and obtained treatment from Rowen on occasion. Rowen anticipated that, after purchasing the house, his parents would come to visit every one to two years.

Rowen did locate a house, at 15230 Old Seward Highway in Anchorage. But, with his own fears of exposure, he didn't want to have any assets in his name. He hadn't filed tax returns since 1992 and he was still under criminal investigation. He wanted to have Quantum Health Trust purchase the house. Rowen said the trust was interested in acquiring the property, but couldn't obtain financing. Rowen's parents purchased the house instead. Rowen executed all the documents for purchase of the house, under authority of a power of attorney from his parents. The power of attorney was dated March 22, 1995.[7] Two days earlier, on March 20, 1995, Rowen had executed a lease agreement with his parents and prepaid them one year's rent, in the sum of $24,000.00, for the house. Rowen got the money for the rent prepayment from the sale of his condominium.

The purchase price for the house was $255,000.00. A down payment of approximately $102,000.00 was made for the purchase. Rowen's rent prepayment was applied to the down payment and the balance was paid by the trust. No portion of the down payment was paid, personally, by Rowen's parents, although they obtained the financing for the remainder of the purchase price, $153,000.00. Contempora-

---

3. Rowen was asked on cross-examination whether he was a United States citizen. Rowen's response was, in essence, that it depended upon how you defined a U.S. citizen and that, at that time, he believed he wasn't a U.S. citizen. Rowen did confirm, however, that he was born in the United States and was living in Alaska at the time he filed his Form 1040NR.

4. Def.'s Ex. R (Plea Agreement in *United States v. Rowen*, Case No. A97–047–CR (JWS), in the United States District Court for the District of Alaska), at p. 7.

5. Def.'s Exs. R, AA, GG.

6. Def.'s Ex. JJ.

7. Pl.'s Ex. 23; Def.'s Ex. G.

neously with this transaction, Rowen's parents conveyed the house to Quantum Health Trust under an unrecorded land sale contract.[8] After the lease prepayment period had expired, Rowen made his lease payments to the trust. The trust, in turn, made the mortgage payments on the house. Rowen said Stradley was intimately involved with the house transaction "every step of the way." He said Stradley told him he shouldn't have the house in his name, because he was a target and could get sued. Rowen lived in this house from the time of its purchase until he moved to California in October of 2001. His parents came to visit three to four times during the period that he lived in the house.

The trust had acquired real property other than the house for investment purposes. Although Rowen helped locate of some of this investment property, realtor Cloyd Moser was the one who assisted the trust in acquiring the property, mostly raw land which was held for appreciation.[9] The trust purchased parcels in Kenai, Anchor Point and Trapper's Creek.

Two years after the house was purchased, in April of 1997, an indictment was entered in federal court charging Rowen with four counts of making false claims for payment to the United States and one count of corrupt endeavor to impede the IRS investigation which had commenced in 1993.[10] Rowen was represented by counsel in this criminal proceeding, and ultimately entered a plea of guilty to the charge of corrupt endeavor to impede the IRS investigation.[11] The factual basis for the plea was:

On or about March 29, 1993, the defendant [Rowen] was informed that he was under investigation for potential criminal tax violations. On or about March 29, 1993 and March 31, 1993, the defendant provided information to the investigating agent that was false and misleading, i.e., he told the agent that (1) he had talked to a specific accountant about his activities when he in fact had not spoken to that accountant, and (2) he had spoken with an IRS revenue agent, which conversation the defendant had recorded, before filing his first Form 1040NR when in fact that conversation took place after the defendant filed his first Form 1040NR. On or about August 13, 1993, the defendant filed "Notices of Interest" against the property of the special agent investigating him and the IRS District Director, knowing that such notices would encumber their property, in an effort to intimidate the IRS unlawfully into terminating its investigation. During September 1993, the defendant made phone calls to various witnesses in an effort to keep them from cooperating with the IRS investigation by threatening to sue them or to attempt to have a license revoked. The defendant engaged in this conduct for the sole purpose of ending the IRS investigation into potential criminal tax violations by him.[12]

As part of the plea agreement, Rowen agreed to diligently cooperate with the IRS with the object of filing true and

8. Pl.'s Ex. 23; Def.'s Ex. K.

9. Rowen said that Cloyd Moser had initially approached him about investing in some properties. Rowen told Cloyd that it sounded o.k. to him, but that it was up to the trustee for Quantum Health Trust and that everything had to be done through the trust.

10. Def.'s Ex. AA (Indictment in *United States v. Rowen*, Case No. A97–047–CR, in the United States District Court for the District of Alaska).

11. Def.'s Ex. R.

12. *Id.* at pp. 7–8.

correct income tax returns and paying past due taxes for the years 1991 through 1997.[13] Rowen was placed on probation for a period of 10 months. Special conditions of supervision placed upon him included:

> The defendant shall cooperate with the reasonable requests of Internal Revenue officers in a good faith, best efforts attempt to pay any outstanding tax liability, including any assessed penalty and interest.
>
> *The defendant shall pay in full any outstanding tax liability, including penalty and interest, or enter into an installment payment plan with the Collection Division of the Internal Revenue Service (IRS) within sixty (60) days from the final assessment.*
>
> . . . .
>
> The defendant shall file accurate income tax returns for the years 1992 through 1996, within six months from the date of sentencing.
>
> The defendant shall timely file accurate future income tax returns as required by law . . . .[14]

The plea agreement was executed by both Rowen and his attorney.

Rowen's indictment in 1997 coincided with a tax audit of the Quantum Health Trust. Rowen said Stradley asked him to find a certified public accountant to assist with the audit, because the former accountant for the trust had died. Rowen knew Juline Magden, a C.P.A., through his medical practice. He discussed the situation with her and asked her to contact Stradley. Stradley retained her to help out with the audit, but Magden said she ultimately ended up doing tax returns for the trust, as well.

Magden organized all of the trust's records for the audit. This entailed several requests for records from Stradley regarding the set-up of the three-tiered trust system. Magden had concerns about the legitimacy of the second and third trusts, and requested authorities from Stradley about their validity. Stradley never addressed Magden's concerns satisfactorily. Ultimately, Stradley either resigned or was removed as trustee of Quantum Health Trust. An associate of Magden's, Frank Avezak, was appointed successor trustee. The second and third trusts were terminated. Rowen testified that he believed this decision was made by Magden and Avezak; he wasn't consulted. On Magden's recommendation, Rowen was also removed as general manager of Quantum Health Trust. Rowen complained that he lost all control of the trust once this happened.

After Rowen was indicted, he said publicity was so bad that he had to close his business, Omni Medical Center. He closed it on December 31, 1997, but started a new business the next day at the same location. Magden and Avezak assisted him with this. Rowen said he was a "1/3 employee" of Complimentary Medical. Avezak and Magden had another one third of the business and Rowen's nurse, Pat Hayes, had the remaining third. Rowen said that Magden and Avezak also stepped in to run the health supplement store. At this time, according to Rowen, his financial condition was "wretched."

In accordance with the plea agreement Rowen entered in late 1997, he filed federal income tax returns for the years 1992 through 1997. He said Avezak helped him prepare the returns. Avezak apparently had a power of attorney for Rowen at this

---

13. *Id.* at pp. 2–3.

14. Special Conditions of Supervision, attached to Def.'s Ex. R [emphasis added].

time.[15] Rowen signed his returns for 1992 through 1996 on March 10, 1998. His 1997 return was timely filed in 1998.

After Rowen filed his tax returns, the trust audit was concluded. The IRS issued an audit report which found that Quantum Health Trust was an abusive trust. According to Magden, the audit report disallowed almost every deduction and picked up all of the income from the trust—from the health supplement store, the trust's real estate investments and Rowen's leasing of the medical equipment he placed into the trust—and "double assessed" it against both Rowen individually and the trust.[16] Both Rowen and the trust were served with 90–day letters, giving them an opportunity to contest the audit findings. The trust initiated a proceeding in tax court to contest the audit results. Rowen didn't. He said he lacked the funds to do so. Because Rowen didn't contest the audit, he was individually assessed with additional tax for the years 1993, 1994, and 1995.[17]

To make his returns for 1996 and 1997 consistent with the audit findings, Rowen prepared amended tax returns for those years in April of 2000. The Form 1040X that Rowen submitted with each of these amended returns contained the following notation:

> Taxpayer was notified in January, 2000 that all items of taxable income and deduction from Quantum Health Trust were being assessed to taxpayer for

years 1993, 1994 and 1995. Taxpayer (the creator of the trust) had until March, 2000 to file an appeal in Tax Court. Taxpayer did not appeal. Taxpayer is now filing amended returns for years subsequent to 1995 to report all items of taxable income and deduction formerly reported by the trust.[18]

Rowen testified that his returns for 1992 through 1997 were true, correct and complete to the best of his knowledge.

Attorney Janet Bolvin represented Quantum Health Trust in its tax court proceeding. This proceeding was concluded in March of 2001, almost one year after Rowen's amended returns for 1996 and 1997 had been filed. A closing agreement was entered that identified Rowen as the taxpayer and which provided, for federal income tax purposes only, that:

1. Quantum Health Trust will be disregarded for federal income tax purposes for all taxable periods before, during, and after the taxable periods which are before the Tax Court in Case No. 3312–00;

2. Robert J. Rowen agrees that for the years 1993, 1994 and 1995 there was no substantial change in the way his business and personal matters were handled before and after the formation of the trust;

3. Robert J. Rowen agrees that the trust is his alter ego and that the assets held in the name of the trust are his assets for income tax pur-

---

**15.** *See* Letter by Magden to Stradley, dated July 8, 1997, at p. 3, included with Pl.'s Ex. FF.

**16.** A "double assessment" is also known as a "whipsaw." This procedure is used by the Internal Revenue Service in instances where it can't decide which of two taxpayers is liable for a tax. The tax is imposed on both taxpayers until liability is ultimately resolved between them.

**17.** According to IRS Form 4340s (Certificates of Assessments, Payments and Other Specified Matters) for Rowen for the years 1993, 1994 and 1995, Rowen was assessed for the audit deficiencies on May 22, 2000, in the following amounts: $49,970.00 for 1993, $50,109.00 for 1994, and $65,946.00 for 1995. *See* Def.'s Exs. B, C and D at p. 2.

**18.** Def.'s Ex. W, at p. 421; Ex. Z at p. 439.

poses, except for that certain parcel of real property located at 15230 Old Seward Highway, Anchorage, Alaska, concerning which he specifically denies ownership, the ownership of which the parties agree to leave unresolved for purposes of settlement and pursuant to the terms of settlement of Quantum Health Trust v. Commissioner, U.S. Tax Court Case No. 3312–00;

4. Robert J. Rowen agrees that all income, expenses, deductions and credits allowed by the Internal Revenue Code, which were reported by the trust, should have been reported and have, in fact, been allowed on his individual income tax returns for taxable years 1993, 1994 and 1995;

5. Robert J. Rowen agrees that he is liable for the additional tax, civil penalties and interest on his individual income tax returns that may arise because of the non-recognition of Quantum Health Trust.[19]

The closing agreement was signed by Bolvin as the taxpayer's representative on March 29, 2001. Bolvin wrote "POA" under her signature. Rowen did not sign the agreement. He stated at trial that he didn't have anything to do with this document. He said Bolvin had not been authorized to sign it on his behalf and he did not agree to its terms, especially the provision regarding the trust being his alter ego.

Rowen had, in fact, given Bolvin a power of attorney prior to the time of the assessments of trust income against Rowen and his filing of amended returns. On May 27, 1999, Rowen had executed a Form 2848, Power of Attorney and Declaration of Representative ("POA"), which authorized Bolvin to represent him in tax matters concerning 1040 income taxes for the years 1990 through 1997.[20] Bolvin signed the POA on May 28, 1999. At trial, Rowen was asked if he had filed a written revocation of this POA with the IRS. His recollection was that he hadn't done so.

Bolvin testified that she had been retained by Avezak in 1999 or 2000 to represent Quantum Health Trust. She said that before she filed the tax court petition for the trust, she had explained to Rowen that it would be a conflict for her to represent both him and the trust and that he should get another attorney. Bolvin also testified, however, that Rowen had told her specifically to file the tax court petition for the trust because he didn't want the trust's taxes assessed against his father as beneficiary of the trust. Bolvin said she executed the closing agreement for the trust, not Rowen.

The testimony of Stephen Baker, an attorney for the IRS, contradicted Bolvin's statements about the closing agreement. Baker was the trial attorney for the government in the trust's tax court case, and wrote the closing agreement. He said he personally dealt with Bolvin when drafting the closing agreement. He knew that Bolvin was representing the trust in the tax court case, but he said Bolvin told him she also represented Rowen. Because of the apparent conflict of interest, he checked IRS records and found Bolvin's POA for Rowen before proceeding with the closing agreement.[21]

**19.** Pl.'s Ex. 7.

**20.** Pl.'s Ex. 4, pp. 388–389; Def.'s Ex. LL.

**21.** Baker stated that closing agreements were the standard method of closing cases where a

double assessment had been made. Before a tax court case involving double assessments could be closed, the government required a closing agreement from the taxpayer who agreed to be responsible for the tax liability. However, in the Quantum Health Trust case,

In June of 2001, the IRS issued a notice of intent to levy and, on June 18, 2001, it prepared a notice of federal tax lien reflecting assessments against Rowen of $605,438.69 for 1040 tax liability for 1992 through 1997.[22] Rowen filed his chapter 7 petition on June 21, 2001. He said he filed because there was no way he could ever expect to pay the taxes, penalties and interest assessed by the IRS. The IRS tax lien was recorded in the Anchorage Recording District on June 28, 2001,[23] and subsequently withdrawn because it had been filed post-petition. On September 17, 2001, Rowen filed this adversary proceeding against the United States seeking a determination regarding the dischargeability of these taxes.

*Discussion*

■ A tax debt is excepted from discharge if "the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax."[24] Rowen has not filed fraudulent returns. The issue here is whether Rowen has willfully attempted in any manner to evade or defeat his tax debt. The United States bears the burden of proving, by a preponderance of the evidence, that this debt is excepted from discharge.[25]

■ A willful evasion of taxes includes both "a conduct element (an at-tempt to evade or defeat taxes) and a mens rea requirement (willfulness)."[26] A debtor's failure to pay taxes, by itself, does not constitute a willful attempt to evade or defeat such taxes.[27] However, a failure to pay taxes is relevant evidence which should be considered under the totality of the debtor's conduct to determine if he has willfully attempted to evade or defeat taxes.[28] Several courts have found that an intentional failure to file tax returns, coupled with a failure to pay taxes, constitutes a willful evasion of taxes which will except the tax debt from discharge under § 523(a)(1)(C).[29]

■ Viewing the totality of Rowen's conduct, I find that he has evaded his tax obligations. From 1992 up until the time of his criminal indictment, he failed to file tax returns. And, even after filing the returns, he has not paid any portion of his tax liability for 1992 thorough 1997. Rowen also engaged in other affirmative conduct designed to defeat his tax obligations. He filed a Form 1040NR for 1991, even though he was not a nonresident alien and had previously filed proper tax returns. He created a tiered trust arrangement, which he acknowledged was intended to be a tax deferral mechanism, for the purported reasons of protecting his assets, insulat-

Baker said the closing agreement was a mere formality, because Rowen had already included the trust's tax liability on his returns.

22. Pl.'s Ex. 8.

23. *Id.*

24. 11 U.S.C. § 523(a)(1)(C).

25. *Grogan v. Garner,* 498 U.S. 279, 287–88, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

26. *Tudisco v. United States (In re Tudisco),* 183 F.3d 133, 136 (2nd Cir.1999); *see also Griffith v. United States (In re Griffith),* 206

F.3d 1389, 1396 (11th Cir.2000); *United States v. Fegeley (In re Fegeley),* 118 F.3d 979, 983 (3rd Cir.1997); *Matter of Birkenstock,* 87 F.3d 947, 951 (7th Cir.1996).

27. *See Griffith,* 206 F.3d at 1392–93; *Fegeley,* 118 F.3d at 983; *Birkenstock,* 87 F.3d at 951–52.

28. *Fegeley,* 118 F.3d at 983; *Birkenstock,* 87 F.3d at 951; *Dalton v. Internal Revenue Serv.,* 77 F.3d 1297, 1301 (10th Cir.1996).

29. *United States v. Fretz (In re Fretz),* 244 F.3d 1323 (11th Cir.2001); *Fegeley,* 118 F.3d 979; *Toti v. United States (In re Toti),* 24 F.3d 806 (6th Cir.1994).

ing himself from lawsuits and repaying his father. Yet, at the time of the trust's creation, Rowen had no significant assets. There is also no evidence that Rowen had been a target of lawsuits, either before or after the creation of the trust. After creating the trust, Rowen stopped filing returns altogether, though he still continued to earn reportable income from his medical practice.

When Rowen learned that he was being investigated for criminal tax violations, he filed a civil suit against his accountant and the internal revenue agents in an attempt to thwart the investigation. Because of his concerns over the criminal investigation, he arranged for the trust to purchase a house; he resided there but didn't want to have this asset in his name. It was only after he was criminally indicted and entered a plea agreement, in 1997, that Rowen filed tax returns for 1992 through 1997. The filing of these returns was a condition of the plea agreement. The plea agreement also required Rowen to either pay his taxes in full or enter into an installment payment plan. Rowen has satisfied neither of these conditions. He has paid no part of his tax debt.

 The totality of Rowen's conduct establishes that he attempted to evade or defeat his taxes for the years 1992 through 1997. Additionally, I find that his conduct was willful. "[A] debtor's attempt to avoid his tax liability is considered willful under § 523(a)(1)(C) if it is done voluntarily, consciously or knowingly, and intentionally."[30] Fraudulent intent is not required.[31] Instead, it must be shown that the debtor had a duty to file income tax returns and pay taxes, that he was aware of this duty,

and that he voluntarily and intentionally violated that duty.[32]

 These elements have been established here. The first element, that the debtor had the duty to file returns and pay taxes, is uncontroverted. As for the second element, I find that Rowen knew he had these duties. He did file income tax returns and pay taxes before he attended the Equitrust seminar and created the trust. He was reminded of this duty when he entered the plea agreement, but still hasn't paid any of his tax debt. Rowen voluntarily and intentionally violated these duties. Even after the trust was created, Rowen still had earnings from his medical practice. But he failed to file returns and did everything he could to avoid tax liability. He attempted to thwart a criminal investigation and placed a substantial asset, a house in which he resided, into the trust's name to protect it from the tax collector. He has intentionally failed to file tax returns and to pay taxes. His tax obligations will be excepted from discharge.

 Rowen argues that it is his constitutional right to try to minimize his tax liability. He says he had legitimate reasons for establishing the Quantum Health Trust and notes that he relied on the advice of an attorney in creating the trust and operating his affairs afterwards. He also argues that the United States hasn't proven that Quantum Health Trust was an illegal trust, and that the closing agreement entered in the trust's tax court proceeding isn't binding on him. I find none of these arguments persuasive. Rowen's efforts, including the creation of the tiered trust arrangement, were not directed at

**30.** *Fretz,* 244 F.3d at 1330; *see also Griffith,* 206 F.3d at 1396–97; *Tudisco,* 183 F.3d at 137; *Fegeley,* 118 F.3d at 984; *Birkenstock,* 87 F.3d at 952; *Dalton,* 77 F.3d at 1302; *Toti,* 24 F.3d at 809.

**31.** *Fretz,* 244 F.3d at 1330.

**32.** *Id.; citing Griffith,* 206 F.3d at 1396; *Fegeley,* 118 F.3d at 984.

legitimate tax planning. His total reliance on Stradley doesn't justify or excuse his conduct. Rowen's inquiries regarding asset protection were made solely to those who would give him the answers he wanted, Equitrust Consultants and those affiliated with it. And Rowen's arguments regarding the legitimacy of the trust and the unenforceability of the closing agreement are immaterial. He has not contested the assessments for trust income for 1993, 1994 or 1995 and his amended returns for 1996 and 1997, which he has testified are true and accurate, have included trust income for those years.

■ Finally, Rowen contends his ultimate filing of accurate tax returns has somehow purged his prior behavior so that his taxes can be discharged. He says that, since the returns aren't fraudulent and the taxes don't fall within the scope of the other discharge exceptions contained in § 523(a)(1), his tax debt should be discharged. This argument also fails. A taxpayer's subsequent recantation and filing of returns, even if coupled with a partial payment of taxes, has been found not to forgive the initial conduct which constituted willful evasion.[33]

*Conclusion*

Rowen willfully failed to file his tax returns for 1992 through 1997, and failed to pay his taxes for those years. His tax debt is excepted from discharge pursuant to 11 U.S.C. § 523(a)(1)(C). A judgment in favor of the United States will be entered consistent with this memorandum.

---

**33.** *See Fretz,* 244 F.3d 1323 [tax debt was not discharged in case where doctor, who was a serious alcoholic and failed to file returns for 10 years, subsequently recanted, filed his returns and made partial payments to the I.R.S.]; *Meyers v. Internal Revenue Serv. (In re Meyers),* 196 F.3d 622 (6th Cir.1999) [the willfulness of the debtor's earlier evasion of taxes was not nullified by his subsequent change of heart and partial payment of taxes owed].